**FILED**

November 12, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ pg

DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| JILLIAN HARROD, individually and heir to the estate of JUSTIN HARROD | § § § | |
| Plaintiff, | § | |
| v. | § | Case No. 1:24-cv-388 |
| | § | |
| LLANO COUNTY, TEXAS, BILL BLACKBURN, BYRON CERVANTEZ, RANDY SHAW, AND TRAVIS GLOSSON | § § § § | |
| Defendants. | § § | |

## **PLAINTIFF'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Jillian Harrod, alleging violations of the Civil Rights Act and 42 USC § 1983, against  Llano County, Texas, Sheriff Bill Blackburn, Individually and as Sheriff of the Llano County Sheriff's Office, Deputy Byron Cervantez, Deputy "Ty" Shaw, and Deputy Travis Glosson and would show as follows:

## **INTRODUCTION**

Llano County Sheriff's Deputies arrived at the front stoop of the home of Justin Harrod—a Christian, music-loving, baseball coaching, cheer and pageant dad, father-of-two—and executed him, shooting him in the head while he was lying face down on the ground in front of his own house. This case is about justice for Justin and his family, and safety for the community in Central Texas.

## **PARTIES**

1.      Plaintiff Jillian Harrod is an individual residing in Llano County, and is the wife to Justin Harrod, deceased, hereafter referred to as "Mr. Harrod." She sues in her individual capacity and as heir to the estate of Mr. Harrod.

2.      Defendant Llano County is a municipal governmental entity within the State of Texas and the public employer of Bill Blackburn, Sheriff of the Llano County Sheriff's Office, Deputy Byron Cervantez, and Deputy "Ty" Shaw. The County of Llano may be served with process by serving the Sheriff, Bill Blackburn; the County Attorney, Dwain Rogers; the County Clerk, Marci Hadeler; or any of the County Commissioners: Peter Jones, Linda Raschke, Mike Sandoval, and Jerry Don Moss, at 801 Ford Street, Room 101, Llano, TX 78643, or anywhere they may be found.

3.      Defendant Bill Blackburn, Individually and as Sheriff of the Llano County Sheriff's Office (hereinafter referred to as "Defendant Sheriff Blackburn"), at all times relevant, was a resident of the State of Texas, and was an employee for the Llano County Sheriff's Office. He can be served with process at the Llano County Sheriff's Office, 2001 North State, Hwy. 16, Suite A Llano, Texas 78643, or anywhere he may be found.

4.      Defendant Deputy Byron Cervantez, Badge #763, Individually (hereinafter referred to as "Defendant Cervantez"), is an individual and, at the time of the incident, was a duly appointed and acting officer of the Llano County Sheriff's Office, acting under the color of law, under the color of the statutes, ordinances, regulations, policies, customs, and usages of Llano County. He can be served with process at the Llano County Sheriff's Office, 2001 North State, Hwy. 16, Suite A Llano, Texas 78643, or anywhere he may be found.

5.      Defendant Officer Randy "Ty" Shaw, Badge #768, Individually (hereinafter referred to as "Defendant Shaw"), is an individual and, at the time of the incident, was a duly appointed and acting officer of the Llano County Sheriff's Office, acting under the color of law, under the color of the statutes, ordinances, regulations, policies, customs, and usages of Llano County. He can be served with process at the Llano County Sheriff's Office, 2001 North State, Hwy. 16, Suite A Llano, Texas 78643, or anywhere he may be found.

6.      Defendant Deputy Travis Glosson, Badge #757, Individually (hereinafter referred to as "Defendant Glosson"), is an individual and, at the time of the incident, was a duly appointed and

acting officer of the Llano County Sheriff's Office, acting under the color of law, under the color of the statutes, ordinances, regulations, policies, customs, and usages of Llano County. He can be served with process at the Llano County Sheriff's Office, 2001 North State, Hwy. 16, Suite A Llano, Texas 78643, or anywhere he may be found.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction because Plaintiff is asserting claims against Defendants for violation of decedent's Fourth Amendment Rights against unreasonable search and seizure, which is incorporated upon the States through the Fourteenth Amendment. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(3) (civil rights).

8.      Because Defendants' actions, inactions, and failure to comply with the applicable laws all occurred or failed to occur in Llano County, Texas, venue is appropriate in the Austin division of the Western District of Texas under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

9.      Justin Harrod was the loving husband of Jillian Harrod and father of two children and full-time "bonus dad" of Mrs. Harrod's two daughters.

10.     Justin Paul "Boots" Harrod was born in Fairbanks, Alaska on June 14, 1982.

11.     He grew up in Burnet, Texas during his Junior High and High School years and then moved to Kingsland.

12.     He went to college at Texas State Technical College.

13.     He worked as a heavy equipment operator for most of his life, but more recently enjoyed a career with LCRA as a surveyor. Mr. Harrod was in training for a long-awaited promotion to a management position when he was killed.

14.     Justin loved music and listened to various genres, including folk and country. He enjoyed playing his banjo and played the piano occasionally.

15.     Justin was also very proud of his Irish Heritage.

16.     Justin had a big infectious smile that could light up any dark room. He was genuinely a happy person and it radiated through him onto others. He loved to sing and dance, and he danced everywhere he went, shaking his hips and twirling his wife around.

17.     Justin loved spending time with friends and family more than anything else. He had a very close relationship with Jillian's mother, Julie Tewell Johns, who he always called "Mom in Love." They loved talking and spending time together over a cup of coffee.

18.     Justin had an older brother named Lonnie and a twin brother named Jordan (Joe) Harrod, with whom he had a special and close relationship.

19.     Justin loved taking his daughters for special drinks at the local coffee house where they could sit and talk and then get their hair done at the local salon. He was a devoted father to his daughters, taking them to their cheer competitions and pageants.

20.     8-year-old Juliana was Justin's favorite little "Panda Bear" and he had recently been teaching her to dance, making lots of special memories together.

21.     13-year-old Jacey was Justin's little "Duckie," and she loved spending time kayaking together on the river most with her "Bonus Dad."

22.     7-year-old Karis was Justin's little "Kare Bear" and was the apple of her Daddy's eye.

23.     12-year-old Parker always loved to play video games with his Dad, talk about the latest happenings at school, and have fun on family outings.

24.     His children meant everything to Justin. He went with the kids to cheer practice, competitions, games, and even beauty pageants. No matter how busy life or work was, family was always a top priority to Justin.

25.     Justin dated his wife, Jillian Harrod, for about four years and they married on June 27, 2021, in Key West, Florida.

26.     Justin loved people and people loved Justin. He was all about forming good relationships with good people. Justin genuinely cared about people and took time to get to know them, brighten their day and was a strong friend for all to lean on.

27.     On October 23, 2022, at the age of forty, Justin Harrod's life was senselessly cut short when Defendant Cervantez and Defendant Shaw shot and killed Mr. Harrod while he was lying prone on his stomach in his own front yard.

28.     At the time of the shooting, Mr. Harrod did not pose an imminent threat of death or serious bodily injury to the deputies.

### *The Shooting*

29.     On the night of October 22, 2022, and the early morning of October 23, 2022, Mr. Harrod went out dancing with his wife Jillian and multiple friends. During this time, although Mr. Harrod did drink some alcohol, he did not consume any illegal drugs.

30.     Mr. Harrod and his wife arrived at their home in the early hours of October 23.

31.     After arriving home, Mr. Harrod went to retrieve his firearm. Mr. Harrod was on his property with his own firearm.

32.     Mrs. Harrod heard what she believed to be a shot and went to a neighbor's house to call the police, worried about her husband's safety.

33.     Mrs. Harrod called 911 at approximately 5:50 am because she believed her husband had shot himself. She told dispatch that he was intoxicated and not being himself. Mr. Harrod had been having a difficult time with his mental health that day, as it was the one-year anniversary of his father's death. When the 911 operator asked if Mr. Harrod was threatening suicide or threatening her, Mrs. Harrod made clear he was not threatening her but instead he stated, "I am going to end this, I am going to kill myself" and got the gun.

34.     Llano County Police Deputies arrived approximately 15 minutes after Mrs. Harrod's 911 call at 6:05 am. Both day shift deputies starting their shifts and night shift deputies just ending their shifts arrived on the scene.

35.     Mr. Harrod was asleep, lying prone on his stomach on the ground, and making no threats to himself or anyone.

36.     Shortly after arriving at Mr. Harrod's home, Defendant Cervantez, Defendant Shaw, Deputy Bowman, Deputy Idol, Deputy Glosson, and Deputy Wesson drew their guns and tasers and pointed them at Mr. Harrod, waking him up.

37.     Some of the Deputies' first words spoken to Mr. Harrod when he woke up were "Don't make me shoot you."

38.     Mr. Harrod was visibly confused, stating "Why would you shoot me?"

39.     Deputy Bowman then proceeded to say, "Do not make me kill you" to which Mr. Harrod confusedly replied, "Why would you kill me?"

40.     Instead of clarifying the situation, Deputy Bowman continued yelling at Mr. Harrod. Throughout the interaction, many of the deputies used taunting tones towards Mr. Harrod.

41.     Mr. Harrod appeared confused and distraught. He continued asking the Deputies why they would shoot him or want to kill him.

42.     Mr. Harrod also expressed confusion at the number of deputies surrounding him, stating, "There's five of y'all and one of me."

43.     Because he had passed out, Mr. Harrod was on the ground outside when the police arrived. He was shirtless, laying facedown, elbows out, hands to the sides of his face. His gun was under his body, but it was difficult to move.



44.    The police told Mr. Harrod to both "Get away from the gun," but also instructed him to not move, instructions that directly conflict with each other and would therefore be impossible to follow.

45.    Because of Mr. Harrod's prone body position, his body weight, and the placement of his head and hands in relation to the position of the gun, he posed no imminent threat of death or bodily harm to the Deputies.

46.    Despite Mr. Harrod's position, the Deputies continued yelling at Mr. Harrod.

47.    This situation, with five deputies surrounding Mr. Harrod while he was secured on the ground, continued for 18 minutes.

48.    After Mr. Harrod yelled back at the Deputies, Deputy Glosson fired a taser at Mr. Harrod.

49.    Llano County Sheriffs are required to call out taser before shooting a taser for the safety of themselves and others.

50.    Deputy Glosson failed to properly call out "taser" before shooting Mr. Harrod. Prior to the firing of the taser, multiple deputies made comments about using non-lethal weapons, rather than lethal weapons.

51.    Deputy Glosson failed to create a plan of who would restrain Mr. Harrod after the use of the taser, a necessary move in taser procedure.

52.    The moment the taser was deployed, Defendant Cervantez and Defendant Shaw knowingly and intentionally shot Mr. Harrod multiple times with their service weapons with the intent to kill.

53.    Mr. Harrod began screaming, as he had been shot in the head and was bleeding on the ground, and he rolled on his back, away from the gun. Despite the fact he was not grabbing towards or touching his gun, the Deputies began yelling at him to drop the weapon.

54.    The Deputies then proceeded to roll him on his stomach, kneel on him, and handcuff him. Meanwhile, his face—including the gunshot wound—were shoved senselessly into the grass and dirt.

55.    It was at this point Mr. Harrod began to repeat "I'm dying." Only then did the Deputies begin giving proper medical aid.

56.    According to the autopsy of Mr. Harrod, the police shot Mr. Harrod twice: once on the left side of his face below the left eye and once in the right forearm.

57.    The Medical Examiner ruled Mr. Harrod's death a homicide.

58.    Throughout his entire interaction with the police, Mr. Harrod remained lying down prone.

59.    At all times relevant, the Defendants had Mr. Harrod in plain view and fully surrounded.

60.    One or more Deputies had tasers and firearms trained on Mr. Harrod.

61.    Mr. Harrod never once moved his weapon or even his arm in any way towards the deputies.

62.    Defendant Cervantez and Defendant Shaw shot and killed Mr. Harrod even though he never pointed a weapon in their direction.

63.    At 40:40-40:47 on his own body camera footage, Deputy Russell Wesson stated, "I never could see the gun. I never saw it." and Deputy Ronny Bowman replied, "I know." (Body Camera Footage of Deputy Ronny Bowman at 38:31-38:37). The Body Camera footage of Defendant Deputy Shaw at 22:29 shows that Mr. Harrod remained in the exact position he had been in before

the taser was fired. This was the same position he was in when he was shot. His position did not change until *after* being tasered and shot twice.[1]



64.    Deputies Wesson, Bowman, and Idol's, and even Defendant Glosson's, Incident Reports confirm Mr. Harrod did not raise his gun. Mr. Harrod did not move his body whatsoever until after Defendant Glosson tased him and Defendant Deputies Shaw and Cervantes shot him in the face as depicted in horrifying detail in Deputy Shaw's body camera footage.

65.    At no time did Mr. Harrod ever put any of the Deputies in a situation where they could fear for their lives. There were five armed deputies surrounding Mr. Harrod and the body camera footage clearly demonstrates Mr. Harrod did not move.

66.    Mr. Harrod was shot and killed less than one (1) second after the taser was deployed. It was physically impossible for him to reach for the gun, much less put the deputies in fear for their lives in that period of time.

67.    Defendant Cervantez then proceeded to go into Mr. Harrod's home and taser his dog in front of his children. He discharged the taser without regard to the presence and closeness of the

---

[1] Body Camera footage of Defendant Deputy Shaw:
https://photos.onedrive.com/share/D874B50A0C567964!230548?cid=D874B50A0C567964&resId=D874B50A0C5
67964!230548&authkey=!AFQZoi0GHTLvZ8o&ithint=video&e=SSoUCA

children. Deputy Bowman then proceeded to make one of the children remove the nodes of the taser from the family dog.

68.    The deputies and Lt. Investigator Bill Fritsch also repeatedly changed the story they told Mrs. Harrod and her mother in the aftermath of the shooting.

69.    Mrs. Harrod returned to her home shortly after Mr. Harrod was put into an ambulance. Her mother, Julie Tewell, arrived at Ms. Harrod's home around the same time.

70.    Shortly after arriving back home, Mrs. Harrod and Ms. Tewell saw a helicopter fly off from a nearby field.

71.    Lt. Fritsch told Ms. Tewell that Mr. Harrod was airlifted to a hospital in Austin and that Mr. Harrod was in the helicopter that they saw fly off.

72.    Despite the fact Lt. Fritsch said this, he already knew at this point that Mr. Harrod was already dead and his body was not on the helicopter when he made this statement to Ms. Tewell.

73.    In response to Lt. Fritsch's story that Mr. Harrod was airlifted to a hospital in Austin, Mrs. Harrod and Ms. Tewell proceeded to spend hours calling hospitals to determine Mr. Harrod's whereabouts.

74.    At approximately 12:30 P.M. on October 22, Lt. Fritsch asked Mr. Harrod to gather the children and leave her home because the Texas Rangers needed to investigate the scene.

75.    When Mrs. Harrod had gathered all of her children, only then did Lt. Fritsch tell her that Mr. Harrod had died.

76.    Upon and information and belief, Lt. Fritsch knew Mr. Harrod had died hours before he notified Mrs. Harrod in front of their children.

77.    One of the Sheriff deputies delivered Mr. Harrod's body to the local funeral home by approximately 9:00 A.M. on October 23 – nearly 3 hours before Lt. Fritsch told Mrs. Harrod about Mr. Harrod's death.

78.    Ms. Tewell and two other individuals met with Lt. Fritsch at approximately 4:00 P.M. to further discuss the shooting of Mr. Harrod.

79.    Lt. Fritsch told a story involving Mr. Harrod pointing the gun at his own head, which was untrue. The body camera footage of all five present deputies confirmed that the initial stories told to Mrs. Harrod, Ms. Tewell, and the children about Mr. Harrod pointing the gun at his own head were wholly untrue.

80.    Mr. Harrod was lying prone on the ground in his front yard during the entirety of the 18-minute encounter with the Deputies.

81.    The Deputies had Mr. Harrod secured on the ground at his own house, where he was sleeping when they arrived, and yelled at him while he was in distress, and then executed him right there on his own property.

82.    The footage demonstrates that Mr. Harrod only moved *after* being shot.

83.    Deputy Chief of the Llano County Sheriff's Office Brad Evans had multiple conversations with Mrs. Harrod about Mr. Harrod's death.

84.    Deputy Chief Evans had viewed video evidence of the shooting of Mr. Harrod before he approached Mrs. Harrod.

85.    Mrs. Harrod asked, "Did Justin ever point the gun at his own head?"

86.    Deputy Chief Evans confirmed that Mr. Harrod did not point the gun at his own head, directly contradicting Lt. Fritsch.

87.    Mrs. Harrod also asked if Mr. Harrod ever pointed the gun at the deputies.

88.    Deputy Chief Evans responded that he could not answer that question because of the ongoing investigation, but the fact is Mr. Harrod did not.

89.    When asked by the press what exactly led to deputies opening fire, Evans had no comment.

90.    On May 1, 2023, Deputy Chief Evans arranged with Mrs. Harrod a time he could deliver the Defendant Deputy's body camera videos.

91.    When delivering the videos, Deputy Chief Evans told Mrs. Harrod that the Sheriff's Office made policy changes because of how it handled Mr. Harrod's death.

92.    Ms. Harrod called Deputy Chief Evans to arrange for the return of Mr. Harrod's personal items that the Sheriff's Office had in mid-May.

93.    Lt. Fritsch was the officer who met Ms. Harrod to return the personal items.

94.    Lt. Fritsch also stated that he was now training other officers on how to handle situations similar to Mr. Harrod's circumstances.

95.    Like Deputy Chief Evans, Lt. Fritsch confirmed that the Sheriff's Office recognized it mistakenly handled Mr. Harrod's death and was making changes to learn from it.

96.    This horrible tragedy was 100% preventable. A man was sleeping in his front yard and the situation was under control until Sheriff's Deputies arrived at his home. The Sheriff's Deputies unnecessarily escalated the situation and ultimately killed Mr. Harrod.

### *Llano County Sheriff's Office's History of Violating Citizen's Rights*

97.    Unfortunately, tragedies like what happened to Mr. Harrod are nothing new for the Llano County Sheriff's Office.

98.    The Llano County Sheriff's Office has a history of failing to adequately train, supervise, or discipline deputies.

99.    The Llano County Sheriff's Office has a history of continuing to employ deputies long after their propensity for excessive force and unlawful arrests becomes clear.

100.    In 2016, Jeffrey Grey Wise was shot and killed by three members of the Llano County Sheriff's Office. Officers claim that he was armed, but in the seven years since the shooting, Llano County Sheriff's Office has not released the body camera footage.

101.    In 2018, a grand jury indicted Sheriff's Deputy Duncan Roberts on counts of official oppression after he and another officer attempted to pick a home's lock, and then broke down the door to arrest the individual inside.

102.    In an interview with local news station KXAN, Sheriff Blackburn called Roberts "a really good man."[2]

103.    On January 5, 2019, Sheriff's Deputy Jackson Idol, one of the very same officers involved in the present case, arrested James Michael Glenn for having a crushed beer can in the back of his son's car. Deputy Idol then threw Glenn to the ground and placed him in a chokehold, causing Glenn to fall unconscious. When he regained consciousness, Glenn tried to get up and Deputy Idol repeatedly punched him in the face and hands. Glenn suffered a collapsed lung and a damaged diaphragm because of Deputy Idol's actions.

104.    Despite knowing all these facts, the Llano County Sheriff's Office's still to this day employs Idol.

105.    On January 13, 2019, Johnny Spradlin called the national suicide prevention hotline for help. His call was referred to the Llano County Sherriff's office, and Llano County deputies Steve Sifford and another officer arrived, slammed him to the ground and tasered him for no reason while conducting a "welfare check" at his home.

106.    In July 2019, Sifford was charged with Assault Family Violence and Unlawful Restraint after the Llano Police Department received a Domestic Violence complaint regarding him. He was ultimately discharged by the Llano County Sheriff's Office.

107.    In September 2019, Sifford was arrested on a felony charge for possession of child pornography.

---

[2] https://www.kxan.com/investigations/series-of-indictments-nearly-wipes-out-llano-police-department/

108.    The Llano County Sheriff's Office's history indicates a culture of violence, corruption, lack of training, and a lack of accountability among its deputies. As a result of this culture and failure to train and take accountability for their actions, Mr. Harrod ultimately lost his life.

## CAUSE OF ACTION: EXCESSIVE FORCE – CERVANTEZ, SHAW, AND GLOSSON

109.    Plaintiff restates, re-allege, re-aver, and hereby incorporate by reference any and all allegations contained in the above paragraphs as if fully set forth herein.

110.    Plaintiff brings a claim against Defendant Deputies Cervantez, Shaw, and Glosson, individually,  pursuant to 42 U.S.C. § 1983.

111.    Defendants Cervantez, Glosson, Shaw, without justification and the need to do so, used excessive and deadly force as described above and killed Harrod without legal justification. Defendants Cervantez's, Shaw's, and Glosson's use of force was clearly excessive and clearly unreasonable because Harrod never made any threatening gestures toward Defendants Cervantez, Shaw, and Glosson and did not pose an immediate threat to the safety of Defendants Cervantez, Shaw, and Glosson, or others.

112.    The force used by Defendant Cervantez was excessive, and therefore violates the Fourth Amendment of the United States Constitution, which prohibits unreasonable searches and seizures.

113.    At all relevant times, Defendant Cervantez had actual awareness that Mr. Harrod had constitutional protection against unreasonable search and seizure. Despite having actual awareness of these protections, Defendant Cervantez violated the constitutional rights of Mr. Harrod and caused his wrongful death.

114.    The force used by Defendant Shaw was excessive, and therefore violates the Fourth Amendment of the United States Constitution, which prohibits unreasonable searches and seizures.

115.    At all times relevant, Defendant Shaw had actual awareness that Mr. Harrod had constitutional protection against unreasonable search and seizure. Despite having actual awareness

of these protections, Defendant Shaw violated the constitutional rights of Mr. Harrod and caused his wrongful death.

116.    The force used by Defendant Glosson was excessive, and therefore violates the Fourth Amendment of the United States Constitution, which prohibits unreasonable searches and seizures.

117.    At all times relevant, Defendant Glosson had actual awareness that Mr. Harrod had constitutional protection against unreasonable search and seizure. Despite having actual awareness of these protections, Defendant Glosson violated the constitutional rights of Mr. Harrod and caused him significant pain, physical and psychological injury, and his eventual death.

118.    Further, Defendants Cervantez's, Shaw's, and Glosson's conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before Defendants Cervantez and Shaw shot and killed Harrod, and before Defendant Glosson tasered him. *See e.g., Reyes v. Bridgewater*, 362 Fed. App'x 403, 409 (5th Cir. 2009) ("The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or other.") More specifically, the right to be free from the use of excessive force was clearly established under the circumstances presented to Defendants Cervantez,Shaw, and Glosson. *See Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 417-18 (5th Cir. 2009) ("It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officers or others.").

119.    As a result of these Constitutional violations to Mr. Harrod and the injuries he sustained, Plaintiff seeks compensation, individually and as the personal representative on behalf of the Estate of Justin Harrod, deceased, as set forth more specifically below.

## CAUSE OF ACTION: INADEQUATE TRAINING – LLANO COUNTY SHERIFF'S OFFICE AND LLANO COUNTY *MONELL* LIABILITY

120.    Defendant Llano County is liable under 42 U.S.C. § 1983 for failing to train their deputies and *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Moreover, Llano County had the following policies and/or practices in effect prior to the shooting:

   a.   Inadequate supervision of deputies regarding their use of force;

   b.   Employing excessive force;

   c.   Employing deadly force disproportionately;

   d.   Inadequate warning systems to discipline and/or weed out potentially dangerous deputies;

   e.   Failing to adequately investigate use of force by deputies; and

   f.   Inadequate training.

121.    Llano County Sheriff Bill Blackburn is responsible for establishing the policies, rules, regulations, ordinances, and procedures under which each and every one of the LCSO employees must act.

122.    The use of excessive force and the arrest without probable cause of the citizens of Llano County, Texas, including Plaintiff, by members of the LCSO was so widespread and pervasive as to have the force of law.

123.    Further, the lack of policies and procedures to provide for the safe and lawful treatment of individuals detained by the police amounted to a widespread practice that, although not explicitly authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law.

124.    The lack of established policies, rules, regulations, and procedures caused the violation of Plaintiff's civil rights under the United States Constitution, and, consequently, the damages suffered by Plaintiff.

125.    As stated in paragraphs 95-106, the violation of Plaintiff's rights by Defendants was not an isolated incident; violating the rights of Plaintiff and those similarly situated to Plaintiff was the rule, not the exception, of Llano County by and through the LCSO.

126.    On information and belief, the policymakers within the LCSO and Llano County actually or constructively knew or should have known that the lack of policy, rule, regulation or procedure would cause this type of civil rights violation. This is because of the widespread nature of the custom, general knowledge of its existence, and numerous opportunities and responsibilities of the responsible policymakers to be informed.

127.    Sheriff Blackburn, as Sheriff for Llano County and the Llano County Sheriff's Office, was a policymaker with respect to Llano County and the LCSO. As Sheriff, Sheriff Blackburn had final policymaking authority by direct delegation from the Llano County governing body, both express and implied, with respect to the unconstitutional actions taken by the LCSO and its officers, as well as the lack of action taken in response to constitutional violations.

128.    As policymaker for the County, Sheriff Blackburn explicitly approved the deputies' actions, thus imputing liability to the County. *See Davidson v. City of Stafford*, 848 F.3d 384, 395-396 (5th Cir. 2017), as revised (Mar. 31, 2017) (citing *Monell*, 436 U.S. at 690–91)). Ratification of a deputies' decision by a policymaker with final decision-making authority may constitute the official policy of the municipality. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 926, 99 L. Ed. 2d 107 (1988).

129.    Each of these policies were actually known, constructively known, and/or ratified by the Llano County and its policymakers and were promulgated with deliberate indifference to Mr. Harrod's rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution. Moreover, the known and obvious consequence of these policies was that the County of Llano Sheriff's Office Deputies would be placed in recurring situations in which the

constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here would occur.

130.    Llano County's policies/practices were the moving force behind Mr. Harrod's death and caused the constitutional injuries he suffered.

131.    As Sheriff and the individual in charge of policy decisions for the Llano County Sheriff's Office, Defendant Sheriff Blackburn had the duty to ensure deputies like Defendant Deputies Cervantez and Shaw received proper training for use of tasers. This is to prevent what is known as "contagious gunfire," where an officer hears another officer's taser and mistakes it for a gunshot. Training deputies to properly yell "taser" before firing prevents contagious gunfire. But because there was no such warning, other Deputies shot after Defendant Glosson's taser fire.

132.    Defendant Blackburn, as a Sheriff, has policymaking authority for the Llano County Sheriff's Office. He possesses final authority to establish municipal policy with respect to the training of all Llano County deputies. The clearly deficient training of deputies with regard to use of warnings before firing tasers rises to the level of deliberate indifference to constitutional rights of individuals such as Mr. Harrod.

133.    Defendant Blackburn also had the duty to ensure deputies like Defendant Cervantez, Defendant Shaw, and Defendant Glosson received proper crisis intervention training ("CIT"). CIT gives deputies a basic understanding of mental health issues and appropriate de-escalation and communication tactics. CIT is completely different than typical police training. For instance, situations involving mentally ill persons require a greater degree of patience and can require use of CIT tactics for extended periods of time. Properly trained CIT deputies understand they cannot let the pressure of time be a factor in their decision making. The training also instructs that when handling situations where an individual is in emotional distress, deputies should not shout instructions at the individual.

134.    On the phone call with 911, Mrs. Harrod made it clear that Mr. Harrod was not threatening to harm others.

135.    Plaintiff adopts and incorporates herein by reference all preceding paragraphs. In addition to violating the rights guaranteed to Mr. Harrod by the Fourth and Fourteenth Amendments to the United States Constitution, Defendants, acting under color of law, violated the rights guaranteed to Mr. Harrod by the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution.

136.    As a result of these Constitutional violations to Mr. Harrod and the injuries he sustained, Plaintiff seeks compensation, individually and as the personal representative on behalf of the Estate of Justin Harrod, deceased, as set forth more specifically below.

**CAUSE OF ACTION: DELIBERATE INDIFFERENCE – SHERIFF BLACKBURN**

137.    Plaintiff adopts and incorporates herein by reference all preceding paragraphs.

138.    Plaintiffs bring claims against Defendant Sheriff Blackburn, in his individual capacity, as Sheriff of Llano County for supervising Defendant Cervantez, Defendant Shaw, and Defendant LCSO with deliberate indifference.

139.    Defendant Sheriff Blackburn, as the Sheriff of Llano County and supervisor of the LCSO knew or should have known about the danger that Defendant Cervantez and Defendant Shaw would engage in unconstitutional conduct (use of excessive force). As the Sheriff, Defendant Sheriff Blackburn had a duty and the authority to take steps to prevent Defendant Cervantez and Defendant Shaw from engaging in unconstitutional conduct.

140.    Defendant Sheriff Blackburn knew or should have known that the failure to supervise or discipline Defendant Cervantez and Defendant Shaw for violations of citizens' civil rights would cause the type of civil rights violation suffered by Plaintiff.

141.    Defendant Sheriff Blackburn willfully and wantonly deprived Plaintiff of constitutionally protected civil rights afforded by the Constitution of the United States of America and the Fourth

and Fourteenth Amendment, by conspiring to and/or engaging in conduct which caused, encouraged, and continued violations of Plaintiff's civil rights. Defendants are liable for these civil rights violations pursuant to 42 U.S.C. § 1983 and § 1988.

142.    All of these constitutional protections were taken away from Plaintiff by, and as a result of, Defendant Sheriff Blackburn's gross disregard for the law and gross disregard for the United States Constitution while Defendants were acting under color of authority and law.

## DAMAGES

143.    The actions and omissions of Defendants deprived Mr. Harrod of his civil rights under the United States Constitution. Moreover, these acts and omissions by Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiff and proximately caused and/or were the moving force of the wrongful death of Mr. Harrod. Accordingly, Plaintiff assert claims under 42 U.S.C. § 1983.

144.    The conduct of Defendants was done with evil motive or intent or, at the very least, was reckless or callously indifferent to the federally protected rights of Plaintiff. As such Plaintiff requests punitive and exemplary damages to deter this type of conduct in the future.

145.    Plaintiff seeks a declaratory judgment that the actions of Defendants here violated Mr. Harrod's Fourteenth Amendment constitutional rights to Due Process and Equal Protection of the law.

## ATTORNEYS' FEES AND EXPERT FEES

146.    Plaintiff seeks all reasonable and necessary attorneys' fees in this case, including preparation and trial of this lawsuit, post-trial, pre-appeal legal services, and any appeals as required by the Civil Rights Attorney's Fees Award Act of 1976. *See* 42 U.S.C. § 1988. Plaintiff hereby requests that the Court and jury award her attorney's fees and expenses. Plaintiff additionally brings suit for expert fees.

## DEMAND FOR A TRIAL BY JURY

147.    Plaintiff demands a trial by jury of all the issues in this case pursuant to Federal Rule of

Civil Procedure 38(b).

## PRAYER FOR RELIEF

WHEREFORE, cause having been shown, Plaintiff prays for, on trial of this just cause,

judgment against Defendants be found liable, jointly and severally, for the following:

a.   Actual damages above the jurisdictional minimum of the Court;

b.   Compensatory damages;

c.   Exemplary damages;

d.   Prejudgment interest;

e.   Post-judgment interest;

f.   Declaratory judgment that Defendants violated Plaintiff's constitutionally protected rights;

g.   Costs of Court;

h.   Attorney fees and expenses; and

i.   Any such further relief as the Court deems proper and just under the circumstances.

Respectfully submitted,

**KAPLAN LAW FIRM, PLLC**


/s/ *Austin Kaplan*
Austin Kaplan
Texas Bar No. 24072176
akaplan@kaplanlawatx.com

Ryan Estes
Texas Bar No. 24120586
restes@kaplanlawatx.com

Tanner Scheef
Texas Bar No. 24129188
tscheef@kaplanlawatx.com

2901 Bee Cave Rd., Suite G
Austin, TX 78746
Phone: (512) 553-9390
Fax: (512) 692-2788

**COUNSEL FOR PLAINTIFF**